**C & C PLYWOOD CORPORATION, an Oregon Corporation, et al., Plaintiffs and Respondents,**

v.

**John N. HANSON, Commissioner of Campaign Finances and Practices of the State of Montana, Defendant and Appellant.**

**No. CV–76–81–H.**

United States District Court, D. Montana, Helena Division.

Sept. 22, 1976.

Patrick F. Hooks, Townsend, Mont., for plaintiffs.

Mae Nan Ellingson, Missoula, Mont., amicus curiae for Montanans for Safe Power.

William G. Sternhagen, Helena, Mont., David Wing, Butte, Mont., amicus curiae for The Anaconda Co.

Leo Graybill, Jr., Great Falls, Mont., for defendant.

Jack J. Lowe, Helena, Mont., of counsel for defendant, Office of Comm'r of Campaign Finances and Practices.

## AMENDED OPINION AND ORDER

BATTIN, District Judge.

This case involves a request for declaratory relief seeking to have a portion of § 23–4744, Revised Codes of Montana, 1947, declared unconstitutional on the ground that it violates the First and Fourteenth Amendments to the United States Constitution.

## I

BACKGROUND FACTS:

To fully understand the import of this action, it is necessary to set forth in some detail the facts that have resulted in the case being before this Court.

Montana's Corrupt Practices Act, particularly Section 94–1444, R.C.M.1947 (now § 23–4744, R.C.M.1947), prohibited corporations from paying or contributing money for the promotion of the interests, the success, or the defeat of any political party or organization. In 1971, the Montana Legislature, by referendum to the voters, referred a measure with two questions concerning a "sales tax". In disposing of a case seeking to compel the disclosure of information contained in the books of the "Save Our State Committee", the Montana Supreme Court had occasion to consider the application of former Section 94–1444, R.C. M.1947. The Court specifically considered the statute's prohibition against corporations "paying or contributing 'in order to aid or promote the interests, success, or defeat of any political party or organization'." *State ex rel. Nybo v. District Court of the First Judicial District*, 158 Mont. 429, 435, 492 P.2d 1395, 1399 (1972). The Court held that the language of the statute did not prohibit corporate payments or contributions to referendum issues because "a referendum is entirely 'legislative' in character". *Nybo, supra* at 435, 492 P.2d at 1399.

Subsequently, Montana's Forty-fourth Legislative Assembly amended § 23–4744 by adding the words "or ballot issue" to the then-existing statute. The amendment became effective January 1, 1976. Section 1, Chapter 296, Laws of 1975. The statute now reads, in pertinent part, as follows:

"No corporation, bank, . . . *shall pay or contribute* in order to aid, promote, or prevent the nomination or election of any person, or in order to aid or promote the interests, success, or defeat of any political party, organization, *or ballot issue.* No person shall solicit or receive such payment or contribution from such corporation." (Emphasis supplied.) Section 23–4744, R.C.M.1947 (as amended).

The *only* part of the statute questioned in this action is the prohibition against payment or contributions to support or defeat ballot issues.

On July 29, 1976, the Secretary of State of the State of Montana officially certified an initiative to be placed on the ballot in Montana's general election on November 2, 1976. The so-called "Nuclear Proposal" initiative provides for certain amendments to the Montana Major Facility Siting Act, § 70–801, R.C.M.1947, *et sequentes.* The proposed initiative amendment to the Major Facility Siting Act would require legislative approval of any nuclear facility licensed under the provisions of the Act. The requisite number of signatures to have the initia-

tive certified for the November 2 election was obtained primarily through the efforts of a group of interested citizens known as "Montanans For Safe Power."

The plaintiffs herein are sixteen corporations and one bank. Their concern with the certified initiative is to oppose its passage, especially the corporate plaintiffs involved in the energy field. However, any expenditure of money by the plaintiffs to communicate their position with respect to the Nuclear Proposal is prohibited by the amended § 23–4744, R.C.M.1947. Lurking behind the prohibition is the ominous threat of § 23–4768, R.C.M.1947, which states:

> "[A]ny corporation organized under the law of or doing business in the state of Montana may be brought into court on the ground of deliberate, serious, and material violation of the provisions of this act. . . . The court, upon conviction of such corporation, may impose a fine of not more than ten thousand dollars, or may declare a forfeiture of the charter and franchises of the corporation, if organized under the laws of this state, or if it be a foreign corporation, may enjoin said corporation from further transacting business in this state, or by both such fine and forfeiture, or by both such fine and injunction."

Thus, faced with ten thousand dollar fines, the loss of corporate charters and injunctions prohibiting further business transactions in the State of Montana, the plaintiffs sought injunctive and declaratory relief in an original action filed in the Montana Supreme Court on August 12, 1976. Therein, the plaintiffs alleged that the 1975 amendment to § 23–4744, R.C.M.1947, was unconstitutional in several respects. The plaintiffs asserted the amendment was unconstitutional on the following grounds:

1. It violates the First Amendment by abridging freedom of speech and freedom of the press;

2. It violates Article II, Section 7, of the 1972 Constitution of Montana by impairing and abridging the plaintiffs' right to freedom of speech, expression and the press;

3. It violates the Fourteenth Amendment to the United States Constitution by abridging the privileges and immunities which these plaintiffs have as citizens of the United States;

4. It violates Article II, Section 17, of the 1972 Montana Constitution by depriving the plaintiffs of life, liberty and property without due process of law;

5. It denies the plaintiffs the equal protection of the laws; and

6. It violates Article II, Sections 3, 4 and 13, and Article IV, Section 3, of the 1972 Constitution of the State of Montana.

An *ex parte* hearing was held August 12, 1976, and a Temporary Restraining Order issued by the Montana Supreme Court prohibiting the defendant from enforcing the provisions of § 23–4744, R.C.M.1947.

An adversarial hearing was set for August 18, 1976, and because of the "public interest and factors involved" the Supreme Court suspended its rules so it could expedite the matter.

The chronology of hearings and motions that followed and the subsequent removal of the case to this Court bear heavily on the decision to hear this case. It also suggests, at least implicitly, a "tactical" use of the judicial process to support a position on procedural rather than substantive legal grounds due to the unmistakable role of time in the success or failure of an action of this kind.

Following the *ex parte* hearing held before the Supreme Court, the defendant filed a motion for additional time on August 16, 1976. In that motion, the defendant stated he considered

> ". . . the issues raised by the application to be genuine, important and timely, and Defendant welcomes judicial interpretation of Section 23–4744, R.C.M. 1947, as it pertains to 'ballot issues'."

In the next paragraph, the defendant recognized the shortness of time remaining before the general election and supported the Supreme Court's assumption of original

jurisdiction in the cause. Then the defendant *joined* "in the request of plaintiffs that the Court expeditiously hear and consider the matter." In paragraph VIII of the motion, the defendant stated he was "anxious that the matter be heard promptly and thoroughly, and to that intent, intends to *cooperate fully with the Court in expediting the matter*". (Emphasis added.) After stating he would not initiate enforcement proceedings against the plaintiffs while the action was pending, the defendant prayed the Court to grant a briefing schedule which would have culminated in a hearing on the merits of the case on September 9, 1976.

*August 17, 1976,* two additional motions were filed, one to dismiss because the plaintiffs lacked standing, the other to quash the stay because the plaintiffs had an adequate legal remedy.

Notably on *August 17, 1976,* the defendant, John Hanson, Commissioner of Campaign Finances and Practices of the State of Montana, also obtained a Removal Bond from the St. Paul Fire & Marine Insurance Company so that the matter could be removed to the Federal District Court. August 18, 1976, the defendant, through counsel, appeared before the Montana Supreme Court for the adversarial hearing on the original request for injunctive and declaratory relief. At that hearing, the defendant argued the three motions previously filed.

As a result of the motion for more time, at the August 18, 1976, hearing the Montana Supreme Court entered an oral order through the Chief Justice, granting a continuance and setting the hearing on the merits for August 25, 1976.

The same day, August 18th, the defendant filed his petition for removal with accompanying bond in the Federal District Court, Helena Division. Unavailability of a judge caused the matter to be moved to Missoula and the Federal Court of Chief Judge Russell Smith. The necessity of a three-judge court was obviated because the plaintiff's amended complaint seeks only declaratory relief. Judge Smith's calendar and prior commitments would not permit a

more expeditious hearing on the merits than would have been available in this Court. Thus, the matter was moved to the Federal District Court in Billings.

A hearing on the merits was held before this Court September 8, 1976. All briefs were submitted and considered on or before that time. Leave was granted to two parties, the Anaconda Company, and Montanans For Safe Power, to file *amicus curiae* briefs and to argue before the Court. The motion of a third party, the State Central Committee of the Montana Democratic Party, to file an *amicus curiae* brief was denied. The Court is unable to discern a political party's interest in a state statute other than a possible proprietary interest in protecting what it may have accomplished during a legislative session.

## II

At the outset, it is necessary to consider this Court's jurisdiction. Section 28 U.S.C. § 2201 grants Federal District Courts the power of declaratory relief only in those cases or controversies within their jurisdiction.

The petition for removal states alternative grounds for removal based on either 28 U.S.C. § 1331 or 28 U.S.C. § 1343(3). Section 1441 of Title 28 U.S.C. provides the grounds upon which an action can be removed from a state court to a federal district court. Subsection (a) provides:

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States . . . where such action is pending." 28 U.S.C. § 1441(a).

█ To be removable under this section, the case now before the Court would have to be one over which this Court has original jurisdiction. An action based on the Constitution is removable without regard to the citizenship of the parties. 28 U.S.C. § 1441(b). The petition for removal asserts that 28 U.S.C. § 1331 is sufficient to invoke federal jurisdiction in this claim. That section provides federal district courts with

original jurisdiction of all civil actions arising under the Constitution of the United States where the amount in controversy exceeds $10,000. 28 U.S.C. § 1331.

■ The only difficulty posed in this case with § 1331 jurisdiction is the jurisdictional amount, and it exists. The action is one which asserts violations of the First and Fourteenth Amendments and it is civil in nature. In the amended complaint there is no allegation that a specific amount is in controversy. However, were the plaintiffs to proceed in paying or contributing to the support or defeat of the "Nuclear Proposal", the jurisdictional amount and more would be at stake by virtue of the sanctions set forth in § 23–4768, R.C.M.1947. Even though the sanctions are criminal in nature, they are inextricably linked to this civil action. Furthermore, the amount in controversy diminishes in import when rights such as Freedom of Speech and Assembly are the basis of invoking the Court's power because such rights are inherently incapable of pecuniary valuation. *Jordan v. Hutcheson,* 323 F.2d 597, 601 (4th Cir. 1963), citing *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

This Court does have jurisdiction to hear and decide the action now before it because it is one in which the Court would have original jurisdiction if it had been filed in this Court under 28 U.S.C. § 1331. It is therefore properly removable under 28 U.S.C. § 1441 and susceptible to declaratory relief under 28 U.S.C. § 2201.

It is unnecessary to consider a jurisdictional claim premised on 28 U.S.C. § 1343(3).

### III

■ The case involves the threat of enforcing § 23–4768, R.C.M.1947. In *Union Pacific Railroad Company v. Woodahl,* 308 F.Supp. 1002 (D.Mont.1970), this Court found an actual controversy to exist based on a legislative amendment to a statute which had remained unchanged for sixty-two years. A similar situation exists with the statute in question here, § 23–4744, R.C.M.1947, as amended in 1975.

"Assuming that the Legislature did not intend a futile act, the amendment by the Legislature and the enforcement by defendants are closely related for purposes of determining whether a threat of enforcement exists." *Union Pacific, supra,* at 1014.

When the legislative amendment of 1975 is considered in light of the *Nybo* ruling that former Section 94–1444, R.C.M.1947, did not prohibit corporate contributions, it becomes quite evident that the threat of prosecution is real and that an actual controversy exists within the meaning of 28 U.S.C. § 2201.

■ There is a question of whether this Court should abstain from adjudicating the constitutionality of § 23–4744 because the state court has not had the opportunity to construe it. "The doctrine of abstention, however, is not an absolute rule." *Union Pacific, supra* at 1012. Furthermore,

"Abstention is an appropriate response to a federal complaint alleging unconstitutionality of a state statute where state interpretation of its own *ambiguous* statute might serve to render it inoffensive to the federal Constitution." (Emphasis supplied.) *Daniel v. Waters,* 515 F.2d 485, 488 (6th Cir. 1975).

If the statute is not ambiguous, the Federal Court is not allowed to shut its doors to a complaint charging a constitutional violation, "even if there is a possible state remedy which is being pursued." *Daniel v. Waters, supra* at 488. Though a state remedy was sought in this action, and even though many state constitutional grounds are urged as bases upon which to strike the statute, it is still not a case for abstention save on those issues involving purely state law. The statute in question here is clear and unambiguous in all respects. Another factor weighing heavily in the balance of abstention is the length of time required to complete judicial proceedings in another forum considered in light of the time remaining until the November 2, 1976, election.

■ The defendant asserts that plaintiffs in this action have no standing to sue. I

believe they misuse a word of art. But there may be some merit to the claim.

"Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue." *Sierra Club v. Morton*, 405 U.S. 727, 731–732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1971).

When, as in this case, a party does not rely on a specific statute to invoke jurisdiction, the question of standing depends in large part on whether the party has such a personal stake in the outcome of the controversy that it ensures the dispute will be adjudicated in an adversarial context. *Sierra Club, supra* at 732, 92 S.Ct. 1361. The party seeking review must allege facts showing that it will adversely be affected by the outcome of the litigation.

█ When measured against this test, it appears that the only parties plaintiff with standing to sue in this case are: Montana Associated Utilities, Inc.; Montana-Dakota Utilities Co.; Montana Power Company; and, Pacific Power and Light.

I believe the action could be dismissed as to the other plaintiffs on the ground that they lack standing. The Nuclear Initiative primarily involves power, and it is the power companies that want to "pay or contribute" on this matter. I don't think such a dismissal would preclude holding the amendment unconstitutional either on its face or as applied.

Arguably, *Sierra* can be distinguished on the ground that it only involved cases arising under the Administrative Procedure Act. The case was dismissed because there was no standing. I feel the case is broader in its application than just to A.P.A. cases.

On the other hand, standing might exist for all parties if an analogy can be made to the "capable of repetition, yet evading review" doctrine. However, I think not, because that doctrine involves the question of mootness while the question here is standing. It is a question involving judgment in assessing the facts set forth in the complaint when making a determination of whether it sufficiently alleges a "controversy" for all the plaintiffs. There is insufficient evidence before the Court to be able to say with certainty that some of the plaintiffs in this case lack standing.

## IV

The issue to be decided in this case is whether the amendment to § 23–4744, R.C. M.1947, prohibiting corporations from paying or contributing to the promotion or defeat of the "Nuclear Proposal" violates the First and Fourteenth Amendments to the United States Constitution.

### A. Plaintiffs' Contentions.

The briefs and pleadings of the plaintiffs in this case can be reduced to three uncomplicated propositions of law:

(1) Corporations are entitled to first amendment guarantees of free speech;

(2) A corporate person is unable to "speak" without the expenditure of money; and

(3) There is no legitimate governmental interest which can support what it claims to be the unconstitutional regulation of speech set forth in the 1975 amendment to § 23–4744, R.C.M.1947.

### B. Defendant's Contentions.

The defendant's contentions in this case can likewise be simplified—a simplification which produces nearly the converse of the plaintiffs' propositions:

(1) Corporations are creatures of statute with only those rights granted them by the State;

(2) Freedom of speech is an individual liberty not granted corporations;

(3) Corporations are given limited First Amendment rights but only in those cases where due process of law is invoked because of the deprivation of property by some state action; and

(4) There is a legitimate state purpose in the limitation imposed by the amendment to § 23–4744, R.C.M.1947.

## C. *First Amendment Cases.*

It is unnecessary to set forth a legal tome discussing the origins and meanings of the First Amendment. That has been done elsewhere. It is necessary only to state that:

> "The protection given speech and press was fashioned to *assure unfettered interchange of ideas* for the bringing about of political and social changes desired by the people." (Emphasis added.) *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1956).

In assessing the constitutionality of a state statute claimed to be in violation of the First Amendment, as applied to the States by the Fourteenth Amendment, the Supreme Court has employed an approach of balancing interests rather than classifying them. *Baldwin and Cannon v. Redwood City, et al.,* 540 F.2d 1360 (9th Cir., 1976).

> "The following general rule may be drawn from decisions in which state and municipal enactments have been weighed against the First Amendment: Incidental restrictions upon the exercise of the First Amendment rights may be imposed in furtherance of a legitimate governmental interest if that interest is unrelated to suppression of expression and is substantial in relation to the restrictions imposed, and if the restrictions are no greater than necessary or essential to the protection of the governmental interests." *Baldwin, supra* at 1365.

■ But even in the area of permissible state infringement of First Amendment rights of speech, the regulation is most susceptible to failing constitutional muster when the prohibition involves "pure speech" and more likely to stand in areas of "conduct" considered as speech.[1] In this sense the statute must be given careful consideration to determine whether the challenged statute is either more inclusive or more burdensome than necessary to further legitimate governmental purposes.

> ". . . First Amendment freedoms need breathing space to survive, government may regulate in the area *only with narrow specificity.*" (Emphasis added.) *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1962), citing *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; *Baldwin and Cannon v. Redwood City, et al., supra* at 1367.

■ To satisfy the requisite need for breathing space, the statute under consideration "must be the least restrictive means available that would accomplish the legislative purpose." *Baldwin and Cannon, supra* at 1367.

■ A final factor in weighing the balance of governmental interest against the purported infringement of the First Amendment is the communication of information and ideas on public issues to the electorate.

In considering the "fairness doctrine" imposed on broadcasters, the Supreme Court noted the justification for the doctrine in *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968), was the right of the viewers and listeners, not the right of the broadcasters, which is paramount. *Red Lion, supra* at 390, 89 S.Ct. 1794. It may be that the paramount interest in the present case is not the right of the State to inhibit certain kinds of speech, nor the right of corporations to disseminate information. The crucial weight of balance may rest on the electorate's right to be informed on public

---

1. The question of whether the expenditure of money is "conduct" or "speech" within the meaning of the First Amendment was considered in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Supreme Court noted:

> "Some forms of communication made possible by the giving and spending of money involve speech alone, some involve conduct

primarily, and some involve a combination of the two." *Buckley, supra* at 16, 96 S.Ct. at 633.

In this respect, the statute in question may be said to prohibit some "pure speech", some "conduct" and some mixture of the two by its proscription against any paying or contributing by corporations to support or defeat ballot issues.

issues; the very essence of self-government and intelligent decision-making.

### D. *Ballot Issue.*

Close analysis of § 23–4744, R.C.M.1947, requires consideration of what is meant by "ballot issue" in the State of Montana. As was previously suggested, the Montana Supreme Court discussed this issue in the *Nybo* case. The Court there stated:

> "This Court has long held that a referendum is entirely 'legislative' in character." *State ex rel. Nybo v. District Court,* 158 Mont. 429, 435, 492 P.2d 1395, 1399 (1972).

See also *Fitzpatrick v. State Board of Examiners,* 105 Mont. 234, 240, 70 P.2d 285 (1937); *State ex rel. Hay v. Anderson,* 49 Mont. 387, 407, 142 P. 210 (1914). The *Nybo* Court went on to say that:

> "When the Legislature refers a measure to the people, it is seeking the people's voice singly and collectively, by individuals or groups." *Nybo, supra,* 158 Mont. at 435, 492 P.2d at 1399.

Under the Montana Constitution, it is apparent that there is no major difference between the processes of initiative and referendum. Both involve the enactment or approval of legislation by the people. The only significant difference is the manner in which the legislation to be voted upon comes before the people. By referendum, the Legislature refers a matter to the people. On the other hand, either initiative or referendum can be raised by at least five per cent of the qualified electors in each of at least one-third of the legislative representative districts. 1972 Montana Constitution, Art. III, § 4 and § 5. Initiative measures must meet an additional requirement in that the total number of signers of any petition must be at least five per cent of the total qualified electors of the State. 1972 Montana Constitution, Art. III, § 4, Cl. 2.

Because Montana considers initiative and referendum to be legislative, the effect of the statute in question is to prohibit corporations from paying or contributing to the success or defeat of any issue involved in this legislative process. At the same time, it precludes, by the proscription, the dissemination of information by corporations on this kind of legislative issue to a significant part of the electorate. This is so even if measured only by the numbers of signatures of electors required to place an initiative or referendum on the general election ballot. The defendants argue that because an initiative or referendum is voted for by marking the ballot in the same fashion as if voting for a candidate, it is the functional equivalent of voting for a candidate. Thus, according to the defendant's argument, a person casting a vote for or against the Nuclear Proposal is actually voting for a candidate. There is no merit to this position when considered in light of *Nybo* and the cases cited therein.

When considered as a prohibition against participating in or speaking about a legislative process, § 23–4744, R.C.M.1947, as amended, raises a different aspect of the issue to be determined. That is: whether the State of Montana can constitutionally legislate a direct prohibition on the exchange of ideas and information, merely because the source of the information is a corporation.[2]

---

2. The statutory language of § 23–4744 makes no distinction concerning the kind of corporation that is prohibited from paying or contributing for the success or defeat of ballot issues. However, the constitutional frailty of the statute, at least in certain cases, was apparently recognized by counsel for the defendant, as the following colloquy discloses:

THE COURT: Another thought I had in the examples that you made is what certain corporations might be able to do individually or what the law would restrict them from doing on a ballot issue. What thought have you given, or is there a prohibition or an exemption in the law, in dealing with newspapers?

MR. LOWE: Yes, Your Honor, there is.

THE COURT: What is it?

MR. LOWE: It is a duly promulgated administrative regulation, although Mr. Hooks and co-counsel have a habit of deprecating it at some length, but it says at page 7, quoting the Montana Administrative Code, this is really a subject for judicial notice, 44.3.106 S–1060 and S–1080, contributions do not include the cost of any bonafide news story, commentary or editorial distributed through the facilities of any

■ I think not. In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court recognized that in today's mass society the expenditure of money is an inherent element in communicating ideas *and when communication is so limited there are serious adverse consequences.*

"A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976).

broadcasting station, newspapers, or any other general periodical.

That administrative rule follows a similar clause that is in the Federal Corrupt Practices Act to the same effect.

MR. HOOKS: May I comment on that, Your Honor?

THE COURT: Yes.

MR. HOOKS: I would just observe it is much like Mr. Lowe's opinion letters that he has given to some of my clients. It is not in the law; it is merely a relation of an agency of this state.

MR. LOWE: It has the force of law.

THE COURT: Let me ask a question then: let's say one of the newspapers, general circulation newspaper, were to editorialize in favor or opposed to the ballot issue, which you claim this would give them a right to do without coming under the clear language of the statute

. . .

MR. LOWE: Absolutely.

THE COURT: . . . then whichever side thought it was a good editorial decided to buy 100,000 copies of it for distribution, then what happens?

MR. LOWE: Then that person would have made a political contribution or expenditure in your particular example, Your Honor, and that would be a reportable item under the Campaign Finance Act, and if it were done by one of the plaintiffs in this action here, it would be against the law, if I understand Your Honor's question correctly.

THE COURT: If the statute reads, as I understand it to read, namely that no corporation could make a contribution—

Is that what it says?

MR. LOWE: No corporation shall pay or contribute.

THE COURT: Pay or contribute.

—and you have a corporation that happens to be a newspaper, how administratively do you take that out?

The Court further noted that:

"The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensible instruments of effective political speech." *Buckley, supra* at 19, 96 S.Ct. at 635.

Though the initiative here is not "political" *per se,* the principle articulated by the *Buckley* Court is the same. An informed electorate must obtain information on both sides of any issue. The communication of information is inextricably linked to the expenditure of money.[3] Corporations are prohibited from paying or spending money to communicate by § 23–4744, R.C.M.1947.

MR. LOWE: That way right there. After we read *Mills v. Alabama,* we decided it was a nice spot for an administrative rule to remove a constitutional difficulty; that is, a duly promulgated administrative rule.

I did not write it myself.

THE COURT: How is that promulgated?

MR. LOWE: Well, in the usual manner.

THE COURT: Notice is given?

MR. LOWE: Notice is given. A hearing is held. It is published in the Montana Administrative Register, and finally ends up in the Montana Administrative Code.

MR. HOOKS: If I could comment, Mills versus Alabama held unconstitutional, as I recall, a provision of a law that prohibited a newspaper editor from writing an editorial on election day. They said that is an infringement of free speech, and our point is that by this regulation, by these opinions they issue, they are trying to clean up what they recognize by the very issuance of them the unconstitutional features of the Act.

The promulgation of the Administrative Regulation exempting newspapers from the provisions of the statute presents an interesting approach to statutory interpretation. There may be some question concerning the doctrine of "delegation", that is, whether the Montana Legislature intended to give the Commissioner the authority to amend, by regulation, a statute enacted by the Legislature. Assuming, *arguendo,* that it did, what the Commissioner has done here is to construe this statute, certainly a judicial function, thereby hoping to free it of some of the facial overbreadth manifested in the statutory language.

**3.** The *Buckley* Court recognized that the dependence of a communication on the expenditure of money does not introduce a non-speech element into the communication nor does it reduce the exacting scrutiny required by the First Amendment. *Buckley v. Valeo,* 424 U.S. 1, 16, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Thus, there is a direct effect on the corporation's ability to communicate its information. There is a concomitant inhibition of information available for ready access by the electorate.

Both parties agree that in certain cases corporations have been afforded First Amendment rights by virtue of the Fourteenth Amendment. Many cases are cited in both briefs, including but not limited to *N.A.A.C.P. v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); and *Grosjean v. American Press Co., Inc.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). It is also noted that the prevailing parties in the *Buckley* case included political groups which were incorporated, such as the New York Civil Liberties Union and Human Events, Inc.

The defendant attempts to distinguish away the plaintiffs' claim to "Corporate First Amendment Rights," by the facts of the cases cited. The defendant urges that a close reading of all the cases wherein it is suggested corporations have First Amendment rights reveals that they involve property rights. Thus, the distinction between property, which may not be confiscated from corporations, and "liberty," which a corporation does not possess in the first instance, is a sound one according to the defendant and accounts for the difference between a living person and a paper person, "a corporation." By this distinction corporate First Amendment rights would be limited to those situations where the corporation had been denied some property right. The defendant and *amicus* (Montanans For Safe Power) also urge that *Buckley* does not give the right of freedom of speech to anyone that had not held it previously. By their reasoning, corporations have never had an absolute right to free speech and therefore *Buckley* is inapplicable to a corporation asserting a First Amendment right which is not linked with a property right.

, A recent California case relied on *Buckley, supra,* and *Citizens for Jobs and Energy v. Fair Political Practices Comm.,* 16 Cal.3d 671, 129 Cal.Rptr. 106, 547 P.2d 1386 (1976), in finding that corporations or other companies engaged in money-making activities possess First Amendment rights. *Pacific Gas and Electric Company v. City of Berkeley,* 60 Cal.App.3d 123, 131 Cal.Rptr. 350 (1976). Nevertheless, I find it unnecessary to state categorically that corporations do or do not have an absolute right to assert violations of the First Amendment right to free speech.

As was stated at the outset, the critical point of analysis rests on the balance of the interests involved and not on a classification of the kind of case from which the right is derived. When freedom of speech is involved, a balance of the competing interests is had and the governmental interest is weighed against the individual and corporate interests involved. The First Amendment rights of speech and press are the standard against which this balance is measured. Viewed in this manner, the "property distinction" asserted by the defendant diminishes in import as does the statement that *Buckley* grants no new entity First Amendment rights. When the balance test is invoked and applied to the facts of this case, I find the 1975 amendment to § 23–4744 to be a direct infringement of the First Amendment right to receive and to communicate information and ideas.

The only remaining question is whether there is a governmental interest strong enough to compel this infringement.

V

There are two bases set forth by the defendant as legitimate governmental interests substantial enough to tip the balance in favor of suppression of expression. They are: first, the State has an interest in maintaining the integrity of the electoral process by keeping it free from corporate influence. Secondly, that to allow corporate contributions to support or defeat a measure gives a disproportionate voice to large interests. *Amicus* also urges this statute protects the interests of minority

stockholders by keeping corporations from expending money against their will.

I do not think the proposition urged by *amicus*, stated by the defendant in oral argument, is meritorious, given the facts of this case.

The proposition that the Government can attempt to equalize political opportunities for all participants in the electoral process was laid to rest in *Buckley*. In speaking of the ancillary governmental interest in equalizing the relative ability of individuals and groups to influence the outcome of elections, the Court stated:

"But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources," ' and ' "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people".' " *Buckley v. Valeo*, 424 U.S. 1, 49, 96 S.Ct. 612, 649, 46 L.Ed.2d 659 (1976).

██ The protection afforded by the First Amendment against governmental abridgement of free expression cannot properly be made to depend on the financial ability to engage in public discussion, see *Buckley v. Valeo, supra* at 49, 96 S.Ct. 612, even when financial ability may give one perspective some advantage over another.

The infringement of § 23–4744 concerning "ballot issues" is constitutionally infirm if based on this governmental interest.

The other justification urged by the State to support the constitutionality of this amendment to the statute is that it is necessary to preserve the integrity of the electoral process. However, the only part of the record which comes close to supporting this rationalization of the amendment is set forth on page 23 of the defendant's brief. There it is urged that judicial notice could be taken of the proposition that "corporations have laid their heavy hands upon the operation of Montana Government since the days when it was a mere territory, and a

gold-rush frontier." (Defendant's brief, page 23, lines 3 to 10.) There is no legislative finding or history that indicates that what was once true is now true or that this was the reason for enacting the 1975 Amendment to § 23–4744, R.C.M.1947. When Montana's Title on Election Frauds and Offenses—Corrupt Practices Act—is read in its entirety, § 23–4744, *et seq.*, R.C. M.1947, it is quite obvious that the State has an elaborate scheme to maintain the integrity of the electoral process that would not be significantly affected if the 1975 amendment to § 23–4744 were declared unconstitutional. Corporations are subject to nearly every section of the Act as they are deemed to be "persons" for purposes of the Act. Section 23–4777(11), R.C.M.1947. On the other hand, § 23–4744, as amended in 1975, is a significant infringement on First Amendment rights, affecting both corporations and the electorate.

Therefore, I conclude that the State of Montana cannot constitutionally legislate a direct prohibition on the exchange of ideas and information, involved in one form of the legislative process, merely because the source of the information is a corporation. To permit such legislation the State would have to evidence sufficient justification in its purpose to "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Baldwin and Cannon v. Redwood City, supra* at 1369, citing *Buckley v. Valeo*, 96 S.Ct. at 647.

## VI

### CONCLUSION

Whenever the breathing space accorded the First Amendment is crowded by the State, it must be done with narrow specificity.

The Amendment at issue here is narrow and specific only in the sense of the entity and influence at which it is directed. It does not take into account the inextricable link between the expenditure of money and the communication of ideas in a mass society, recognized in *Buckley, supra*. The amendment on its face prohibits corpora-

tions from paying or contributing to the success or defeat of any ballot issue. The literal significance of the proscription applies to intraorganization communication as well as to extracorporate communication. The prohibition precludes a source of information relevant to the legislative process of initiative and thus significantly affects the wise decision-making of the electorate. For this end there is no legitimate legislative purpose which would justify such a direct infringement of the First Amendment as the amended statute presents.

The 1975 amendment to § 23–4744, R.C. M.1947, is unconstitutional as applied to the plaintiffs in this case. It is a direct infringement of the First Amendment unsupported by a legitimate compelling state interest.

Former Justice Hugo Black in a concurring opinion in the *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963), case, stated what he felt was the minimum guarantee of the First Amendment.

"An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment." *N.Y. Times v. Sullivan, supra* at 297, 84 S.Ct. at 735.

I do not hold that corporations have this absolute right *per se*. The ultimate issue is not a fear of the potential corporation influence on a legislative process. It is the ominous threat posed by the power of the State to inhibit the free and open discussion of public issues.

The plaintiffs' complaint seeking a declaration that § 23–4744, R.C.M.1947, as amended by Section 1, Chapter 296, Laws of Montana 1975, is unconstitutional on its face, is hereby granted.

IT IS ORDERED that the Clerk of this Court shall forthwith enter judgment for the plaintiffs and against the defendant.

### ORDER

IT IS ORDERED that the defendant's motion for a stay pending appeal of the above-entitled action is hereby denied.

 In the defendant's motion for a stay pending appeal he asserts that Section 23–4744, R.C.M.1947, is a criminal statute. The Court is not inclined to agree with this assertion. Although a fine and penalty may be imposed, that in itself does not make the statute criminal.